**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES ex rel. JOHN
OWENS,

        *Plaintiff-Appellant,*

        v.

FIRST KUWAITI GENERAL TRADING &
CONTRACTING COMPANY,

        *Defendant-Appellee.*

No. 09-1899

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:06-cv-01386-CMH-TRJ)

Argued: May 13, 2010

Decided: July 16, 2010

Before TRAXLER, Chief Judge, WILKINSON, Circuit
Judge, and Samuel G. WILSON, United States District
Judge for the Western District of Virginia,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Chief Judge Traxler and Judge Wilson
joined.

**COUNSEL**

**ARGUED**: Victor Aronoff Kubli, KUBLI & ASSOCIATES, PC, Vienna, Virginia, for Appellant. Andy Liu, CROWELL & MORING, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Christian L. Simpson, KUBLI & ASSOCIATES, PC, Vienna, Virginia, for Appellant. Richard L. Beizer, David W. O'Brien, CROWELL & MORING, LLP, Washington, D.C., for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Relator John Owens brought this *qui tam* suit under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, against First Kuwaiti construction firm, his former employer. He alleged that the firm billed falsely for deficient work in connection with construction of the U.S. embassy in Baghdad and that it retaliated against him for actions taken in furtherance of his FCA contentions. The district court granted summary judgment to defendant.

The essence of Relator's claim is that defendant failed to live up to its contractual obligations. He produced no evidence either of knowing misrepresentations on defendant's part or of having been mistreated for any actions taken on behalf of his FCA claims. We therefore affirm the district court's judgment. Congress crafted the FCA to deal with fraud, not ordinary contractual disputes. The FCA plays an important role in safeguarding the integrity of federal contracting, administering strong medicine in situations where strong remedies are needed. Allowing it to be used in run-of-the-mill contract disagreements and employee grievances would burden, not help, the contracting process, thereby driving up costs for the government and, by extension, the American public.

## I.

In 2005, the State Department selected defendant, First Kuwaiti General Trading & Contracting Company, to undertake construction of a new U.S. Embassy on a sixty-five acre site in Baghdad. The contracts awarded First Kuwaiti called for the construction of more than twenty buildings, as well as major components of the infrastructure at the embassy compound. The parties represent the construction project to be the largest the State Department had ever undertaken, and the Department's Bureau of Overseas Building Operations ("OBO") had more than one hundred of its own personnel on site, including engineers, supervisors, project managers, and construction workers. Altogether, the contracts totaled close to $600 million. First Kuwaiti billed the State Department in progress payment invoices, as contemplated by the contracts, beginning in late 2005 and ending in September 2008.

First Kuwaiti hired John Owens as a general construction foreman in November 2005, shortly after work had begun. Owens's primary responsibility, however, was to supervise the construction of an office building that did not get underway until some time the following March. In the interim, he was given a variety of assignments to perform at different parts of the embassy site. Almost immediately, Owens says, he was treated rudely by various people he encountered and "got disrespected a lot." By June 2006, Owens had evidently grown dissatisfied with the job and sent an email resigning his position. He says he did so because of the lack of respect shown toward him and because of his objection to the way the company treated its third country national workers. At the time, he was considering filing a mechanic's lien, believing that First Kuwaiti owed him "Salary and Iraq Pay."

In December 2006, Owens filed an FCA *qui tam* suit against First Kuwaiti, alleging that the company had defrauded the government by billing for defective work and that it retaliated against him for investigating possible FCA

wrongdoing. He claimed that he had witnessed a number of "construction mistakes" at the embassy site, which he had brought to the attention of First Kuwaiti employees. He also included a breach of contract claim in which he alleged that First Kuwaiti had wrongfully withheld pay from him.

Owens's fraud allegations triggered the U.S. government's obligation to investigate his claims and to determine whether to intervene in the case. *See* 31 U.S.C. § 3730(a). The government commissioned an independent expert to look into the matter, resulting in a document known as the Collins Report. *See* Report of Johns & Bhatia Engineering Consultants, Ltd. (Dec. 12, 2007) ("Collins Report"). Completed in December 2007, the Collins Report concluded that "the quality of workmanship at the NEC Baghdad site is comparable to that found in the United States for a similar size and type of project. Defects found in the structure were minor and not unexpected for a project of this size and they have been repaired." *Id.* at 10. First Kuwaiti, which had requested a final inspection of its work in October 2007, was granted certificates of final acceptance from OBO in April 2008. Shortly afterwards, the government formally elected not to intervene in Owens's suit.

In November 2008, Owens's breach of contract claim was dismissed with prejudice because of a forum selection clause. His FCA false claims and false statements allegations were dismissed without prejudice for failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). He filed an amended complaint several weeks later. His amended complaint leveled eight different allegations of fraud at First Kuwaiti and contended that, as a result, the invoices and accompanying documentation First Kuwaiti submitted to the government constituted false claims or statements under the FCA. He also repeated his earlier retaliation allegations. Following extensive discovery, First Kuwaiti moved for summary judgment. In responding to First Kuwaiti's motion, Owens abandoned four of his original allegations of fraud but added several new ones on the basis of materials received in

discovery. After a hearing, the district court granted First Kuwaiti's motion for summary judgment in its entirety. This appeal followed.

II.

We review the grant of summary judgment *de novo*. *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). Summary judgment is appropriate if "there is no genuine issue as to any material fact" and First Kuwaiti "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, we must view all facts and reasonable inferences in the light most favorable to Owens, the non-moving party. *Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 603 (4th Cir. 2002).

The FCA provides that suit may be brought against anyone who "knowingly presents" to the government "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). It similarly allows suit against anyone who "knowingly makes . . . a false record or statement material to a false or fraudulent claim." *Id.* at § 3729(a)(1)(B).\* In adopting the FCA, "the objective of Congress was broadly to protect the funds and property of the government." *Rainwater v. United States*, 356 U.S. 590, 592 (1958).

The FCA's scienter requirement does not demand "specific intent to defraud" and can be satisfied by proving only "reckless disregard of the truth or falsity of the information." *Id.*

---

\*The parties differ as to whether amendments to the FCA recently enacted by Congress apply to the false statements portion of Owens's suit. *See* Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621; *compare Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009) *with United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010). Because we ultimately conclude that Owens's claim fails in any event, we shall assume that the amended version, under which Owens need not prove First Kuwaiti sought "to get a false or fraudulent claim paid or approved," applies. 31 U.S.C. § 3729(a)(2).

§ 3729(b). Congress, however, has made plain "'its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S.Rep. No. 99-345, at 7 (1986)). This is because "[t]he FCA is a fraud prevention statute." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999); *see also Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 128 S.Ct. 2123, 2130 (2008). It does not allow a *qui tam* relator to "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373 (4th Cir. 2008).

To avoid summary judgment on his false claims and false statements allegations, Owens must create a genuine issue of fact showing: (1) that First Kuwaiti made a false statement or engaged in a fraudulent course of conduct; (2) that such statement or conduct was made or carried out with the requisite scienter; (3) that the statement or conduct was material; and (4) that the statement or conduct caused the government to pay out money or to forfeit money due. *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) (*Harrison II*). We discuss the application of this standard to Owens's various allegations seriatim, beginning with those related primarily to construction defects raised in his amended complaint.

A.

### 1.  *Use of Concrete*

Owens alleges that First Kuwaiti violated the FCA by billing for substandard concrete work. Owens points to the fact that some of First Kuwaiti's concrete work subsequently needed to be repaired and to statements from First Kuwaiti's quality control personnel who expressed concern that concrete

was occasionally arriving at job sites too far in advance of when it was to be poured, which could negatively affect its quality.

But such occurrences do not, at least in the context of the record of this case, establish a false claim, much less a knowingly false one. As the Collins Report concluded, work on the Baghdad site "was comparable to work performed in the United States for typical similar type concrete structures" and any problems with the concrete work were "minor and not unexpected." Collins Report at 9. It would be remarkable if, on a project of this magnitude and scale, there were not some issues that quality control personnel would want to bring to supervisors' attention. That is after all what a quality control department exists to do. It would be no less remarkable — on a $600 million war-zone project which called for First Kuwaiti to pour an estimated 130,000 cubic meters of concrete—if there were not some construction work that required subsequent remediation. In fact, the embassy contracts anticipated the need to repair concrete problems and provided a mechanism for doing so.

To support an FCA claim, there needs to be something more than the usual back-and-forth communication between the government and the contractor over this or that construction defect and this or that corrective measure. Such altogether routine dialogue is a far cry from fraud. Here there is ample evidence that, in the words of OBO Director General Charles Williams, First Kuwaiti has never had "any shyness on correcting what we bring to their attention." Nor is there any suggestion that First Kuwaiti billed for work it knew to be defective. As Williams put it, "They want to get it right. They have tried very hard to get it right."

Furthermore, the site was full of OBO personnel and OBO inspectors routinely examined and approved First Kuwaiti's work. Evidence that the government officials were aware of any alleged defects and accepted First Kuwaiti's work any-

way "effectively negates the fraud or falsity required by the FCA." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (quoting *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999)). OBO was extensively involved in First Kuwaiti's activities and signed off on "construction mistakes" Owens alleges First Kuwaiti committed. It continued to express satisfaction with First Kuwaiti's work even after hiring an outside expert to investigate his claims. In other words, the record does not establish that the government was misled by First Kuwaiti.

### 2.  *Rebar Sizing*

Owens also alleged in his amended complaint that First Kuwaiti at times used reinforcing steel rods in its concrete—known as "rebar"—that were larger than building plans called for. We do not think, however, that these allegations rise to the level of a genuine dispute over material fact. The Collins Report concluded it was "highly likely that the correct size rebar were used during construction as the rebar was fabricated based on approved shop drawings and each 'concrete pour' was inspected and signed off [on] by representatives of both First Kuwaiti and OBO." Collins Report at 3. Likewise, the Director of Construction for OBO at the site stated that "Mr. Owens' allegations about use of the wrong size rebar are not correct. First Kuwaiti was permitted under industry practices to use larger size rebar than was called for in design plans. I was aware in Baghdad that First Kuwaiti on occasion substituted larger size rebar. That substitution did not negatively affect the structural integrity of concrete walls."

Owens offered nothing to contradict this evidence. All he pointed to was his own conclusory statement that he had "witnessed columns being poured with the wrong size metal inside of them" and that he had seen concrete poured for structures with fewer rebar loops than design plans called for. He also disputed that the government had in fact inspected the

rebar before each concrete pour. Given uncontroverted evidence that the rebar practices he complains of were unproblematic in the sense of being contemplated under the contracts or knowingly ratified and approved by OBO, Owens's allegation that First Kuwaiti used rebar larger than the contracts specified are at most allegations over construction methodology. What Owens's allegations do not raise is an issue of triable fact on the possibility that First Kuwaiti somehow dissembled in billing for its concrete work and submitted actionable false claims. Furthermore, Owens has pointed to no evidence suggesting that First Kuwaiti was billing the government for work it knew to be substandard or for work it knew it had not done. Indeed, First Kuwaiti generally requested that OBO inspect the rebar before its concrete pours, even if, as Owens contends, such inspections did not always take place. *See* Collins Report at 3.

### 3.  Perimeter Wall Height

Owens alleged that the perimeter wall First Kuwaiti built around the complex was not high enough in places. Again, however, the State Department's own inspection and investigations found otherwise. In November 2007, OBO noted that the perimeter wall height "has been verified by our accreditation team that recently visited the site. . . . The bottom line is that the Baghdad perimeter wall meets the design criteria."

The only evidence Owens offers is a finding expressed in a preliminary draft of the Collins Report that the wall was less than the required height in two places. *See* Collins Report at 1 (noting earlier finding). Not only was this assertion disavowed in the final version, but at the time of the inspection on which the preliminary draft was based, grading at the face of the wall had not yet been completed. *See id.* As the draft itself noted, the height of the wall could change once grading was finished. With grading unfinished, it is difficult to say whether height issues within the range that grading could account for could possibly be said to be false. And even if it

were true that First Kuwaiti had billed for a wall built to the wrong height, there is no evidence it did so knowingly. To the contrary, Owens conceded that First Kuwaiti "verified the height of the perimeter wall every twenty meters" to ensure that it met contractual requirements.

### *4. Security Items*

First Kuwaiti was obligated to supply certain security items, such as metal detectors, motion sensors, security cameras, car inspection mirrors, and flashlights. Owens alleged that First Kuwaiti supplied items that were the wrong brand or poor quality. First Kuwaiti, however, offered uncontradicted evidence that it obtained permission from OBO to provide the equipment that it did. The OBO official who served as head of security for the embassy project explained that "First Kuwaiti was permitted to supply this material from local sources, and if any First Kuwaiti equipment broke or was not functional, replacements were available. The small security items that First Kuwaiti provided did not compromise security."

In response, Owens contends that permission to provide the items in question was not granted by the right OBO official. First Kuwaiti disputes this, but even if it were true, it would hardly lead to the conclusion that First Kuwaiti's invoices purported to bill for something other than what First Kuwaiti delivered. Moreover, given the absence of any showing of bad faith on First Kuwaiti's part, there is no basis to conclude that those invoices were knowingly false.

### B.

We turn next to the additional allegations Owens made at summary judgment, which related to the fire protection system in one of the embassy buildings, certain billing issues, and First Kuwaiti's October 2007 request to OBO for a final inspection of its work.

### 1. Fire System

Owens points to evidence suggesting that First Kuwaiti's work in installing a fire protection system at the embassy was substandard. This allegation fails for several reasons. To begin with, his amended complaint did not mention the fire system or anything like it, and it is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint. *See Wahi v. Charleston Area Medical Center, Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) (citations omitted). Under the heightened pleading standard applicable to fraud claims under Fed.R.Civ.P. 9(b), "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Wilson*, 525 F.3d at 379 (internal quotation marks omitted).

Owens argues that since he satisfied Rule 9(b) with respect to some of his allegations, he should now be free to make his new claims. Rule 9(b), however, has not been given such a limited scope. *See Harrison II*, 352 F.3d at 921-22 (rejecting Rule 9(b) objection to "new allegations" only after concluding that the complaint had indeed provided adequate notice and that the claims were not premised on information obtained through discovery); *see also Puerto Rico Elec. Power Auth. v. Action Refund*, 515 F.3d 57, 63 n.4 (1st Cir. 2008); *United States ex rel. Walker v. R & F Properties, Inc.*, 433 F.3d 1349, 1359 n.5 (11th Cir. 2005); *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236-38 (10th Cir. 2000); *Samuels v. Wilder*, 871 F.2d 1346, 1351 (7th Cir. 1989). Rule 9(b) plays an especially important role in the context of FCA *qui tam* actions. For one thing, the complaint must give the government adequate information about the nature of the suit to investigate and decide whether to intervene. *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231 (1st Cir. 2004). For another, "a *qui tam* plaintiff, who has suffered no injury in fact, may be particularly likely to file

suit as a pretext to uncover unknown wrongs." *Id.* (internal quotation marks omitted).

Even if allegations concerning the fire system could now be raised, Owens produced no evidence that First Kuwaiti engaged in some form of deceit. He points to an email exchange that, he claims, supports the conclusion that First Kuwaiti was attempting to conceal defects in the fire system from OBO. But the email shows nothing of the kind. In it, a First Kuwaiti supervisor agrees with a construction crew working on an embassy building that they should "halt all the fixation of works" in the building, replace ceiling tiles, and "clean all shafts that have been fixed," because OBO inspectors were coming the next day to test the fire system—the point being that the fire inspection could not go forward if other work in the building was going on.

This does not suggest fraud. The email did not propose concealing any aspect of the fire system and it does not suggest that First Kuwaiti knew of any deficiency in the fire system. What is more, the supervisor who approved what Owens would like to depict as a cover-up is the same man he continues to laud as one of "the finest people I have ever worked with." Indeed, the fact that "fixation of works" was taking place points, if anything, to the conclusion that the crew was trying to ensure that its performance was satisfactory, not to fob off defective work on the government. In short, the smoking gun Owens claims to have uncovered shoots only blanks.

### 2.   *Progress Payment Computations*

Next, we consider Owens's contention that First Kuwaiti overstated the amount of work it had performed in its progress payment invoices. Owens did not include any allegations about overstating construction progress in his complaint. Although he did accuse First Kuwaiti of "overcharging" the State Department, this was clearly in reference to the complaint's more specific allegations (many of which he later

abandoned) about billing for work that was never performed, that was deficient, or that had not been called for under the contracts. Accordingly, his billing allegations could not now be used to avoid summary judgment.

Even setting this objection aside, however, Owens identifies no evidence that could support the conclusion that First Kuwaiti violated the FCA by overstating its progress. The progress payment invoices it submitted were only estimates. Owens argues that they were for actual work completed, but the only evidence he points to—the fact that the invoices contained terms like "completed %" and did not use the word estimate—does not speak to whether the invoices were estimates or not. Other indications, however, are clear. Not only are progress payments based on estimates the norm in the construction context, but the embassy contracts incorporated Federal Acquisition Regulation clause 52.232-5(b), which provides that the "Government shall make progress payments . . . on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." 48 C.F.R. § 52.232-5(b). The contracts also provided that after request for payment was made, "on the basis of an inspection of the work, [an OBO representative] shall make a determination as to the amount which, in his/her opinion, is then due."

Estimates are not exempt from FCA scrutiny, of course, but to qualify as knowingly false claims for FCA purposes, an estimate must be made by one who either knows of no facts that would support the estimate or has knowledge of facts that preclude the estimate. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) (*Harrison I*). Owens provided no such evidence. The fact that OBO later revised some of the invoices downward is hardly dispositive. OBO itself has stated that "rejecting an invoice does not necessarily indicate that it was submitted fraudulently," giving as an example a situation "where a contractor bills us for a progress payment but we do not agree with the percentage of the

work completed." OBO Internal Mem. to General Charles E. Williams, 1-2 (Aug. 2, 2005). Again, it is not surprising that there would be some billing disagreements, particularly in a project of this magnitude.

Owens also points to evidence indicating that First Kuwaiti billed for design work without first getting government approval of its designs, as required by the contract. But this hardly amounts to billing for work that was "never" completed, as Owens maintains, and in any event, every allegation of breach of contract does not constitute fraud. Owens also alleges that First Kuwaiti overstated its progress reports under one contract that had been modified to remove the construction of a warehouse and motor pool facility, which had originally been included in the contract. There is no dispute that First Kuwaiti properly reduced its total bill for the contract to deduct the value of the deleted project. Nonetheless, Owens contends that First Kuwaiti submitted false bills because it did not adjust the line items on which its progress payments were based to reflect the fact that the project had been excised. It is not clear, however, that this actually resulted in any prematurely accelerated claims. More to the point, Owens has not offered evidence showing this to be anything more than negligence on First Kuwaiti's part. The error, if error there was, was in plain view on the invoices. There was no deception involved. At most there was an oversight that OBO and First Kuwaiti alike committed.

### 3.   *Request for Final Inspection*

Finally, we address one set of allegations particular to Owens's false statements count. On summary judgment, Owens contended that First Kuwaiti's request to OBO for a final inspection of its work constituted an actionable false statement, insofar as OBO later identified problems with the fire system and embassy water treatment facilities. Once again, however, this claim could not be used to avoid summary judgment, since neither the inspection request, nor the

fire system, nor the water treatment plant was mentioned in Owens's amended complaint.

Moreover, on the merits, the allegations were unsupported. We doubt seriously that an inspection request could be said to constitute a false statement and at any rate there was no evidence that any falsity was knowing. A contractor's estimate of his workmanship may indeed differ in its particulars from that of the party that hired him. But the inspection process provides an opportunity for the parties to sort their differences out. What the request for inspection certified was that the project was ready for inspection. It is too facile to suggest that First Kuwaiti was warranting that the inspection it was requesting would result in unqualified acceptance of every aspect of its work on the embassy project.

Finally, Owens cannot point to a false claim to which this allegedly false statement was material. A relator still "must show that the government paid a false claim to prove a violation" of the false statement or record provision of the FCA. *Hopper*, 588 F.3d at 1328; *see also Harrison I*, 176 F.3d at 785 ("[T]he False Claims Act at least requires the presence of a claim—a call upon the government fisc—for liability to attach."). For the reasons discussed, First Kuwaiti has not been shown to have submitted any false claim. And, what is more, the government had no intention of remunerating First Kuwaiti as a result of the inspection request until it was satisfied with the results of the requested inspection.

## C.

The sorts of allegations Owens makes are not ones that we take lightly. But neither is their accuracy a conclusion that may lightly be reached. To be entitled to a trial on his claims, Owens was obliged to come forward with evidence that First Kuwaiti knowingly made false representations. He largely failed to show that First Kuwaiti's claims and statements were arguably false and he failed entirely to show that First

Kuwaiti either had actual knowledge or recklessly disregarded the possibility of its billing for work that was anything other than was claimed. What Owens has presented are garden-variety issues of contractual performance—in this case, under a series of complex contracts pertaining to a construction project of massive scale.

There is a difference between a false statement sufficient to support a claim of fraud, on the one hand, and honest disagreements, routine adjustments and corrections, and sincere and comparatively minor oversights, on the other. "Bad math is no fraud, proof of mistakes is not evidence that one is a cheat, and the common failings of engineers and other scientists are not culpable under the Act." *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) (internal quotation marks omitted). Likewise, "[a]n FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision." *Wilson*, 525 F.3d at 378.

The FCA represents "Congress' efforts to protect the Government from loss due to fraud." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 128 S.Ct. 2123, 2130 (2008). The statute is intended to protect the treasury against the claims of unscrupulous contractors, and it must be construed in that light. S.Rep. No. 99-345, at 11 (1986). But "it just as surely cannot be construed to include a run-of-the-mill breach of contract action." *Wilson*, 525 F.3d at 378. Allowing a remedy for fraud to be put to such use—particularly when the party invoking it is an uninjured third party—also drives up the costs of contracting for the government. Worse still, it threatens to penalize good faith disagreements over matters of commercial judgment. To push the FCA beyond its proper boundaries is thus to invite the prospect of pervasive litigation that would discourage many perfectly honest companies from wanting to do business with the United States.

In this case, Owens's allegations of fraud must be viewed in the context of the close working relationship between First Kuwaiti and OBO throughout the construction of the embassy compound. *See Becker*, 305 F.3d at 288-89. This is not a case where a contractor was left to its own devices to complete a government project with only its commercial conscience as its guide. This was a project that the government was heavily invested in—both because of its cost and because of the importance of making sure the job was done right. The State Department wanted an embassy that functioned well, and it wanted, above all, for its personnel to be safe. Inspectors were called in at every stage, government engineers were on site, and Owens's allegations were thoroughly investigated. The government may rightly have issues with aspects of First Kuwaiti's performance. The merit of such complaints is not for us to say. What is evident, however, is that Owens has not shown anything rising to the level of an FCA violation on First Kuwaiti's part.

From the beginning, Owens's allegations have been in a state of metamorphosis. His original grievance was with the way First Kuwaiti treated its workers—including himself—and his plan was to sue to recover pay he felt he was owed. These concerns soon gave way to one set of fraud allegations that in due course was largely supplanted by another. The impression—of a suit in search of a wrong, rather than a wrong in search of a verdict—is borne out by the fact that Owens has not produced any evidence of deceit on First Kuwaiti's part. Plaintiff's strategy seems to be to throw as many allegations as it can against the wall in the hope one of them will stick, an approach at odds with the purposes of the FCA. A litigant is not entitled to a trial simply by dint of determination.

## III.

We turn finally to Owens's separate allegations that First Kuwaiti retaliated against him for his efforts to investigate

possible FCA wrongdoing. The FCA's whistleblower provision provides a cause of action to any employee who is "discriminated against" by his employer "because of lawful acts . . . in furtherance of" an FCA suit. 31 U.S.C. § 3730(h). To defeat summary judgment on his retaliation allegations, Owens had to establish a genuine issue of fact showing (1) that he took acts in furtherance of an FCA suit; (2) that First Kuwaiti knew of those acts; and (3) that First Kuwaiti treated him adversely because of these acts. *See Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). Here again, he failed to make the necessary showing.

The district court held correctly that Owens had not produced evidence showing that he took any acts "in furtherance of" an FCA suit during his time with First Kuwaiti—that is, that he engaged in so-called "protected activity." *See Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999). Owens claims that he was conducting an investigation into possible fraud when he noted "construction mistakes" to First Kuwaiti and OBO employees. *See* 31 U.S.C. § 3730(h). This, however, does not constitute FCA protected activity. "Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [an employee] was acting 'in furtherance of' a *qui tam* action." *Zahodnick*, 135 F.3d at 914. A protected activity need not indicate that an actual FCA suit was being contemplated, but it must evince some attempt to expose possible fraud. "An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation." *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999). For activity to rise above the level of ordinary critique and constitute a step in preparation for an FCA claim, there must be some suggestion of impropriety or illegality by the employer that the employee is attempting to uncover. The record contains none.

Any large enterprise depends on communication, so it is hardly surprising that Owens at times reported problems he

thought he saw on the site. That he did so does not, of itself, indicate an investigation into possible wrongdoing. We may assume that, like First Kuwaiti, Owens wanted the job done right. As a professional, he was unwilling to countenance work that he thought fell short of the standards that should be met. A desire to see that a client gets its money's worth is, or at least ought to be, routine. As Owens himself put it, "When I saw something that I thought was wrong . . . or if there were mistakes made, yeah, it was my job title to point them out." And in fact the record provides every indication that Owens was not thinking about fraud and that his actions were entirely quotidian. In announcing his resignation, for instance, he praised various colleagues for their professionalism. And he has candidly admitted that he probably would not have brought his *qui tam* action if First Kuwaiti had paid him the money he thought he was owed.

In addition, there is no evidence that First Kuwaiti treated him adversely "because of" his actions. Owens claims that the company retaliated against him by shifting him from assignment to assignment. But he has not produced evidence to show either that the company believed he was attempting to uncover fraud or that such belief was the reason it changed his assignments. Indeed, his own email of resignation stated that during his time on the embassy project, he "did not make any problems or complain because of my loyalty" to First Kuwaiti. The innocent explanation for the treatment he received is the plausible one: Owens was shifted around because the project he was hired to work on was not yet ready to begin. Owens also describes how an engineer on site "disrespected" him after he criticized the way some concrete was being poured, telling him, in Owens's words, "'F you, I know what I'm doing, blah, blah, blah . . .'" To suggest that a coworker's taking umbrage at Owens's criticism of his work is sufficient to show that First Kuwaiti was attempting to punish Owens for investigating fraud borders on the frivolous.

Whistleblowing in response to possible fraud, like fraud itself, is a serious matter. In the case before us, however, the

hallmarks of whistleblowing activity are missing. Owens evidently is an employee with complaints—perhaps legitimate, perhaps not—about the way he was treated at a far-away construction site where all involved were working under difficult conditions to accomplish difficult goals. Whatever other conclusions the record could support, it gives no indication Owens was concerned about fraud while he was working for First Kuwaiti or that the treatment he complains of was driven by fear that he was laying the groundwork for a suit like this one.

## IV.

For the foregoing reasons, the district court did not err in granting First Kuwaiti summary judgment. The judgment is hereby

*AFFIRMED*.