**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 22, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA ex rel.
KEVIN THOMAS; CAROLYN
THOMAS,

     Plaintiffs - Appellants,

v.

     No. 15-3155

BLACK & VEATCH SPECIAL
PROJECTS CORP.,

     Defendant - Appellee.
_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:11-CV-02475-DDC)**
_____

Jason M. Hans (Kirk T. May with him on the briefs), Rouse Hendricks German May PC,
Kansas City, Missouri, for Plaintiffs-Appellants Kevin and Carolyn Thomas.

Nathan F. Garrett (Kathleen A. Fisher with him on the brief), Graves Garrett LLC,
Kansas City, Missouri, for Defendant-Appellee Black & Veatch Special Projects Corp.
_____

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Kevin and Carolyn Thomas (Relators) filed this qui tam action against their former employer, Black & Veatch Special Projects Corporation (BVSPC), alleging violations of the False Claims Act, 31 U.S.C. §§ 3729–3733. Relators claim BVSPC altered documents to obtain visas and work permits from the Afghan government and then falsely certified it had complied with applicable laws to obtain payment under its contract with the United States Agency for International Development (USAID). The district court granted BVSPC's motion for summary judgment, concluding Relators could not prove any alleged false certification was material to USAID's decision to pay BVSPC. The district court also determined Relators could not prove damages. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*

BVSPC is an engineering, consulting, and construction firm based in Overland Park, Kansas. In December 2010, USAID awarded BVSPC Contract No. 306-C-00-11-00506-00 (the Contract), which related to the Kandahar Helmand Power Project (the Project) in Kandahar, Afghanistan. The purpose of the Project was "to increase the supply, quantity, and distribution of electrical power from Afghanistan's South East Power System (SEPS)" with "[p]articular emphasis . . . given to the City of Kandahar."

Under the Contract, BVSPC agreed to complete six deliverable components of the Project, including thirteen subcomponents, and to "provide all engineering, procurement, construction, and other material, equipment and/or services necessary

2

to complete and successfully commission each of the six components in accordance with the requirements of this [C]ontract." The Contract required BVSPC to submit invoices every two weeks and required USAID to pay within fourteen days "after receipt of a proper invoice." After final completion and acceptance, and "[u]pon compliance by [BVSPC] with all the provisions of [the Contract]," USAID was also required to "promptly pay to [BVSPC] any moneys . . . due." The payment-approval process required BVSPC's Chief of Party to coordinate with USAID's Contracting Officer and the Contracting Officer's Technical Representative (Technical Representative).

At the time BVSPC moved for summary judgment on December 23, 2014, USAID had issued notices of final completion and acceptance on ten of the Contract's deliverable subcomponents. Similar notices were currently pending for the three remaining subcomponents.

Relators Kevin and Carolyn Thomas worked for BVSPC in Afghanistan from April 18, 2011, until they resigned on July 2, 2011. The events leading to their resignation began on June 25, 2011, when Mr. Thomas discovered educational documents that had been altered to replace the correct names with the names of seven BVSPC employees, including Mr. Thomas. Mr. Thomas found the documents on a shared network drive using a computer identified as "LighteningBug 1A," which was located in BVSPC's human-resources office and accessible by all BVSPC employees. Immediately after finding the documents, Mr. Thomas reported the discovery to BVSPC's acting Chief of Party, Lynn Liikala-Seymore.

3

Two days later, on June 27, 2011, Mr. Thomas contacted the USAID Office of Inspector General (OIG) and gave OIG copies of the altered documents. On June 29, 2011, Carolyn Thomas met with OIG, provided additional copies of the documents, and described how they had been found. According to Ms. Thomas, OIG was "not that interested in the case." Indeed, OIG personnel stated the documents were an issue between BVSPC and the Afghan government and expressed interest only to the extent BVSPC was "using these forgeries to get more money out of USAID."

Ms. Liikala-Seymore also met with OIG on June 29, 2011. At the meeting, "OIG had copies of apparently altered educational documents and was aware of the Thomases' allegations regarding the forged documents." Ms. Liikala-Seymore and OIG also discussed the BVSPC human-resources personnel working on the Project. In late June or early July 2011, Ms. Liikala-Seymore spoke with USAID's Technical Representative, Tom Bauhan, regarding the altered documents.[1]

---

[1] Relators objected to a declaration from Mr. Bauhan, arguing he is not authorized to speak on behalf of USAID. Before the district court, BVSPC made conclusory arguments that Mr. Bauhan had such authority but did not provide any legal support for its position. For the first time on appeal, BVSPC identifies and analyzes regulations it claims authorize Mr. Bauhan to speak for USAID. Because these arguments were not raised in the district court, we do not consider them. *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002) ("[A]bsent extraordinary circumstances, we will not consider arguments raised for the first time on appeal.").

But most of Mr. Bauhan's testimony is factual and based on his personal knowledge. Thus, even if we assume he cannot bind USAID to an official position, Mr. Bauhan's factual statements based on his personal knowledge as Technical Representative for the Project are properly before us. *See* Fed. R. Evid. 602. Moreover, much of Mr. Bauhan's factual testimony was confirmed by other, undisputed evidence. For example, Ms. Liikala-Seymore testified to her communications with Mr. Bauhan, and Relators did not object to her testimony.

4

In addition, BVSPC instigated an investigation "to determine (a) who created the altered diploma documents and (b) whether the altered documents had been submitted to the Afghan[] government during the work permit and visa application process." On June 30, 2011, BVSPC human-resources personnel held an exit interview with Khalid Afridi, a former employee who had worked primarily on the computer identified as LighteningBug 1A. During his exit interview, Mr. Afridi was questioned about the altered documents, but he denied responsibility and asserted he did not have the necessary software to make the alterations. Mr. Afridi suggested another employee may have tried to "set him up" because they did not like each other. On July 16, 2011, Ms. Liikala-Seymore sent OIG a memorandum describing Mr. Afridi's exit interview. On at least three occasions, BVSPC attempted to obtain copies of the documents filed with the Afghan government, to determine whether the altered documents had actually been submitted to the relevant ministries.[2] The Afghan government did not provide copies of the requested documents. USAID and OIG were similarly unsuccessful in obtaining copies of the relevant documents from

Accordingly, we consider Mr. Bauhan's testimony based on his personal knowledge and facts established by independent evidence, but disregard his opinions regarding the significance of Relators' allegations to USAID's payment decisions.

Relators also object to a declaration from USAID Contracting Officer Alvera Reichert because BVSPC failed to disclose her as a witness under Rule 26(a) of the Federal Rules of Civil Procedure. We do not decide whether the district court properly admitted Ms. Reichert's testimony because we do not rely on it in reaching our conclusions.

[2] Relators cited evidence of a fourth attempt where BVSPC personnel personally visited the ministries to review documents submitted to the Afghan government. According to Relators, the BVSPC representatives "were able to review what had been submitted and no forged diplomas were found."

5

the Afghan government. At OIG's direction, BVSPC ceased its efforts to get the application packets from the Afghan government.

Relators dispute whether BVSPC initially had hard copies of the altered documents in its employee files. BVSPC's human resources manager, Mark Whitehouse, testified that a copy of each application packet would have been made before submission to the Afghan government. But BVSPC was unable to locate copies of the documents actually submitted in its files, and informed USAID that it had not maintained organized records of the education documents filed with the Afghan government.

In a further effort to discover the source of the altered documents, BVSPC hired Hewlett-Packard (HP) to perform a forensic analysis of certain BVSPC computers. Although Relators dispute whether all relevant computers were included in the forensic analysis, HP's analysis indicated that several altered documents were created on LighteningBug 1A. BVSPC summarized the forensic findings in an email to OIG:

> We have completed the forensic analysis on the computers sequestered that include the BVSPC issued computers for the Thomas[es] as well as the "walk-up" computer provided by USAID [LighteningBug 1A]. The Thomas computers appear clean from any pejorative acts regarding falsifying documents; however, we are unable to acquire and check their own personal computers. The USAID computer, however, did include falsified and altered accreditations for a few personnel. Some were actually modified on the computer and others were placed on the computer already modified, most probably by using a flash-drive. The analysis was not conclusive as to who may have altered or added data since there was one universal password that allowed virtually anyone to use the computer.

BVSPC then arranged a conference call during which HP discussed its analysis with OIG and BVSPC gave OIG a copy of the HP report. After HP completed its evaluation, BVSPC turned over the examined computers to OIG, along with chain-of-custody records for each device.

Simultaneously with its investigation, BVSPC attempted to locate and remove all copies of the altered documents from its files to ensure they were not commingled with other documents. Notwithstanding these efforts, in May and September 2012, BVSPC inadvertently filed altered documents as part of work-permit-renewal applications for two employees. BVSPC discovered the submissions in May 2013 and promptly notified USAID. BVSPC also provided the dates it received the work permits and the amount of time the two employees worked on the Project after obtaining permits.

It is undisputed that "USAID never took any adverse action against BVSPC despite its awareness of both the altered document allegations and the inadvertent submissions." The parties stipulated that, from April 19, 2011, to April 18, 2013, BVSPC submitted over fifty invoices to USAID. All but five invoices were submitted after USAID learned of the altered documents. And some of the invoices included charges for work performed by the seven employees for whom altered education documents were discovered. USAID paid BVSPC's invoices and never sought a refund, even after the Relators filed the complaint that is the subject of this appeal. Indeed, in December 2013, USAID and BVSPC modified the Contract to award additional work to BVSPC in Afghanistan. And by the time the parties filed the

7

pretrial order on November 25, 2014, USAID had paid BVSPC over $209 million for its work on the Project.

## B. *Procedural History*

On August 23, 2011, Relators filed this suit in the United States District Court for the District of Kansas. The government declined to intervene.[3] Relators alleged BVSPC violated the False Claims Act (FCA) by "creat[ing] falsified and fraudulent credential documentation (*e.g.*, diplomas)" to obtain visas and work permits for its employees and "[b]y presenting claims to officers or employees of the United States for payment of wages for employees who had work visas and work permits as a result of fraud."

On summary judgment, the district court concluded based on the undisputed facts that USAID knew about Relators' allegations but continued to pay BVSPC even after learning of and investigating the altered documents. In addition, USAID did not demand a refund or take any other adverse action against BVSPC. Under these facts, the district court determined that Relators could not prove BVSPC's alleged violations were material to USAID's payment decisions. Accordingly, the district

---

[3] Although the government itself may assert claims under the False Claims Act (FCA), the FCA also includes qui tam provisions which allow individuals to sue on the government's behalf. 31 U.S.C. § 3730(b). In such cases, the government may intervene but "often declines to do so." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010). When the government does not intervene, the private plaintiff, or relator, may pursue claims individually and, if successful, may be entitled to a percentage of the recovery. 31 U.S.C. § 3730(d).

court granted BVSPC's motion for summary judgment. In the alternative, the district court granted summary judgment based on Relators' failure to prove damages.

## II. DISCUSSION

We review the grant of summary judgment de novo, "apply[ing] the same legal standard used by the district court . . . and examin[ing] the record to determine if any genuine issue of material fact was in dispute; if not, we determine if the substantive law was correctly applied." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). In addition, "we view the factual record and draw all reasonable inferences therefrom most favorably to" Relators as the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

Applying this standard, we agree that Relators cannot prevail as a matter of law because the undisputed facts establish that any alleged contractual or regulatory violation by BVSPC was not material to USAID. We therefore affirm the district court's decision granting summary judgment in favor of BVSPC.

### A. *Materiality Standard*

The FCA imposes liability when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[4] To prove "a false or fraudulent claim" the plaintiff may rely on "either a legally or factually false request for payment." *United States ex rel.*

---

[4] Although Relators did not explicitly identify section 3729(a)(1)(A) as the basis for their claims, the Second Amended Complaint alleges "BVSPC knowingly presented false claims for payment or approval to officers or employees of the United States" and does not identify any other FCA provision that BVSPC allegedly violated.

9

*Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010). Factually false claims "generally require a showing that the payee has submitted 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *Id.* (quoting *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1217 (10th Cir. 2008)). "Claims arising from legally false requests, on the other hand, generally require knowingly false certification of compliance with a regulation or contractual provision as a condition of payment." *Id.* Here, Relators rely on legally false claims—namely, Relators allege that BVSPC falsely certified compliance with the Contract after altering documents to obtain work permits and visas from the Afghan government.

Such claims of legal falsity "can rest [on] one of two theories—express false certification, and implied false certification." *Conner*, 543 F.3d at 1217. Express false certification is based on a "false statement that relates to a claim, whether made through certifications on invoices or any other express means." *Id.* By contrast, "the pertinent inquiry for [implied-false-certification] claims is not whether a payee made an 'affirmative or express false statement,' but whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment."[5] *Lemmon*, 614 F.3d at 1169 (quoting *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 532 (10th Cir. 2000)).

_____

[5] Relators originally based their FCA claim on both express- and implied-false-certification theories, but the district court granted BVSPC's motion to dismiss with respect to the express-false-certification claim. Relators have not appealed that ruling.

10

Although express and implied claims differ, both "nonetheless share some common elements, including a materiality requirement." *Id.* We adopted the materiality element in *Conner*, explaining that "[l]iability [under the FCA] does not arise merely because a false statement is included within a claim"; rather, "the false statement must be material to the government's decision to pay out moneys to the claimant." 543 F.3d at 1219 & n.6 (second alteration in original); *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 443 (6th Cir. 2005) ("[T]he FCA imposes liability only for false statements or conduct which are material to a false or fraudulent claim for money or property from the Government.").

In *Conner*, the plaintiff asserted an express-false-certification claim and argued that by signing a general certification of compliance, the defendant was liable under the FCA based on *any* failure to comply with *any* underlying statute or regulation. 543 F.3d at 1219. We disagreed and adopted the materiality requirement as a means to determine which instances of noncompliance are covered by the FCA. *See id.* at 1219–20. Specifically, we held that a false certification is material "only if it leads the government to make a payment which it would not otherwise have made." *Id.* at 1219.

We have since clarified that "materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid. Rather, it requires only a showing that the government *may* not have paid." *Lemmon*, 614 F.3d at 1170. This standard is consistent with the statutory language of the FCA,

11

which defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

But when applying that standard, our analysis of implied-false-certification claims "focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Lemmon*, 614 F.3d at 1168 (quoting *Conner*, 543 F.3d at 1218). It is not enough that the plaintiff identifies *any* violation of *any* applicable provision as a basis for FCA liability. *See Conner*, 543 F.3d at 1219. Instead, our precedent—consistent with that from other circuits—requires that we consider the purpose of the underlying contract and the significance of the relevant violation to that purpose in assessing whether the alleged violation may have affected the government's payment decisions.

In *Lemmon*, for instance, the defendant had a contract with the federal government to dispose of hazardous and radioactive waste. 614 F.3d at 1166. The plaintiffs alleged the defendant "repeatedly violated its contractual and regulatory obligations by improperly disposing of the contracted-for waste" and then violated the FCA by falsely representing it had fulfilled its contractual obligations. *Id.* Addressing the materiality element, we concluded the district court erred in granting a motion to dismiss where the "[p]laintiffs cited specific contractual provisions under which the government, had it been aware of the violations, may have refused or reduced payment" and the "[p]laintiffs also showed that the violations undercut the purpose of the contracts—the safe and permanent disposal of waste." *Id.* at 1169.

12

Because the alleged violations were central to the purpose of the contract, the plaintiffs sufficiently pleaded materiality.

In *United States v. Triple Canopy, Inc.*, the Fourth Circuit's analysis of the materiality of the alleged violation was similarly informed by the purpose of the contract. The court stated that, in implied-false-certification cases, the materiality requirement

> operates to protect contractors from "onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements" in contracts, because "[p]ayment requests by a contractor who has violated minor contractual provisions that are merely ancillary to the parties' bargain" do not give rise to liability under the FCA.

775 F.3d 628, 637 (4th Cir. 2015) (alteration in original) (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010)); *see also id.* (explaining that "strict enforcement of the [FCA]'s materiality and scienter requirements" is particularly important in implied-false-certification cases because the theory "'is prone to abuse' by parties seeking 'to turn the violation of minor contractual provisions into an FCA action'" (quoting *Sci. Applications Int'l Corp.*, 626 F.3d at 1270)).

The defendant in *Triple Canopy* contracted with the U.S. Government to provide security services at an airbase in Iraq, subject to a contract provision imposing a marksmanship requirement for security guards. *Id.* at 632. When the defendant discovered its guards could not satisfy the requirement, it nonetheless submitted invoices for the guards' services and created false marksmanship records.

*Id.* at 632–33. The contract's purpose was to "ensur[e] the safety of servicemen and women stationed at an airbase in a combat zone." *Id.* at 638. Yet the defendant "knowingly employed guards who were unable to use their weapons properly and presented claims to the Government for payment for those unqualified guards." *Id.* The court held the government had sufficiently pleaded materiality for its FCA claim because the false certification undermined the purpose of the contract. *See id.* at 637–38 ("[C]ommon sense strongly suggests that the Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term, shoot straight.").

Even some courts that have not explicitly adopted a materiality requirement nonetheless determine FCA liability by looking at the significance of the violation in light of the purpose of the contract. For example, in *Mikes v. Straus*, the Second Circuit declined to adopt a separate materiality element but discussed the "related concept" of whether a claim may be considered legally false for purposes of the FCA. 274 F.3d 687, 697 (2d Cir. 2001). The court reasoned that although the FCA "is intended to reach all types of fraud . . . that might result in financial loss to the Government, it does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." *Id.* (citation and internal quotation marks omitted). It therefore held that a claim "is not legally false simply because the particular service furnished failed to comply with the mandates of a statute, regulation or contractual term that is only tangential to the service for which reimbursement is sought." *Id.*

14

We agree that when assessing materiality for purposes of an implied-false-certification claim, the proper focus is on the purpose of the underlying contract and the relevance of the allegedly violated provision to that purpose. Thus, an FCA plaintiff may establish materiality by demonstrating that the defendant violated a contractual or regulatory provision that "undercut the purpose of the contract[]." *Lemmon*, 614 F.3d at 1169. Alternatively, where a defendant violates only a tangential or minor contractual provision, the plaintiff may establish materiality by coming forward with evidence indicating that, despite the tangential nature of the violation, it may have persuaded the government not to pay the defendant. We now apply these principles to the present facts.

### B. *Materiality in This Case*

Here, the express purpose of the Contract between BVSPC and USAID was "to increase the supply, quantity, and distribution of electrical power from Afghanistan's South East Power System," particularly in the City of Kandahar. To that end, BVSPC agreed to complete six components of the Project, including thirteen subcomponents, and agreed to comply with specific performance requirements covering fourteen categories of its construction work, such as environmental assessment, procurement and subcontracting, quality control, and safety.

Relators have not alleged a violation that undermined the Contract's purpose of providing electricity to Kandahar and the surrounding area. In particular, Relators have not alleged that BVSPC falsely certified completion of a Project component or

15

compliance with a performance requirement. And Relators have not alleged that BVSPC provided deficient work on the Project or attempted to cover up any such deficiency. To the contrary, it is undisputed that, at the time of summary judgment, USAID had issued notices of final completion and acceptance of work on ten of the thirteen subcomponents to be completed by BVSPC, with similar notices pending for the other three. Moreover, USAID modified the contract to award additional work to BVSPC. Even viewing the facts in the light most favorable to Relators as the nonmoving party, the record does not reasonably support an inference that BVSPC performed deficiently on the Project.

Although Relators acknowledge that none of the Project components or performance requirements require BVSPC to obtain work permits or visas, they argue that "[i]f the work on the six components was an integral part of the Contract, then employing workers to do that work was an integral part of the Contract. Without work permits, BVSPC employees could not legally work in Afghanistan." It follows then, they argue, that BVSPC materially violated the Contract by altering educational documents to obtain visas and work permits for seven employees. In addition, of more than one hundred regulations incorporated into the Contract, Relators rely on two that require BVSPC to (1) comply with all applicable U.S. and host-country laws and (2) ensure "[a]ll personnel have all necessary passports, visas, entry permits, and other documents required . . . to enter and exit the foreign country." 48 C.F.R. § 52.225-19(d)(1), (e)(2)(iii). Relators allege BVSPC's creation of altered documents

16

violated the Afghan Penal Code and therefore violated the Contract's requirement to comply with Afghan law.

Even if we assume that BVSPC altered the documents and thereby violated Afghan law, Relators have not established that the violation undercut the purpose of the Contract. Relators instead rely on general regulatory provisions incorporated by reference into all international government contracts. *See* 48 C.F.R. § 52.225-19(b) (explaining that section 52.225-19 "applies when Contractor personnel are required to perform outside the United States"). Nothing in the Project-specific provisions of the Contract addressed this issue. As we have already determined, violations which are merely tangential to the purpose of a government contract, standing alone, are insufficient to satisfy the materiality requirement under the FCA. *See Conner*, 543 F.3d at 1219. And Relators offer no evidence to demonstrate that the alteration of documents may have influenced USAID not to pay BVSPC, despite the tangential nature of the violation. The undisputed evidence instead confirms that USAID did not withhold payment after learning of Relators' allegations.

Specifically, the undisputed facts establish that USAID knew Relators had discovered altered documents and that they alleged the documents had been used to fraudulently obtain work permits and visas. USAID also knew that HP's forensic analysis confirmed at least some of the documents had been altered on a BVSPC computer and that some altered documents were actually submitted to the Afghan government in 2012. Although investigative efforts failed to identify the person responsible for the alterations, USAID was aware that the evidence strongly

17

suggested someone at BVSPC had altered documents. Notwithstanding this information, USAID never took any adverse action against BVSPC.

To the contrary, from April 19, 2011, to April 18, 2013, BVPSC submitted over fifty invoices to USAID. The invoices included charges for work performed by employees whose educational documents had been altered. Yet USAID never withheld payment on any BVSPC invoice, never demanded a refund of payments made to BVSPC, and never invoked any of the discretionary remedies incorporated into the Contract. *See, e.g.*, 48 C.F.R. § 52.216-7(g) (granting authority for the Contracting Officer to perform an audit and reduce payment for non-allowable costs or adjust for overpayments); *id.* § 52.225-19(h) (permitting the Contracting Officer to direct the removal or replacement of any personnel who fail to comply with contractual requirements); *id.* § 52.232-16(c) (allowing USAID to reduce or suspend progress payments for failure to comply with a material contractual requirement); *id.* § 52.249-6(a)(1) (providing for discretionary termination of a contractor if it is in the government's interest). Rather, USAID accepted BVSPC's work and paid all BVSPC invoices without objection or reservation. At the time of summary judgment USAID had paid over $209 million on BVSPC's invoices, the majority of which were submitted after Relators and BVSPC had notified USAID about the altered documents.

Thus, even if BVSPC violated the Contract by altering educational documents for its employees, the undisputed facts show that the violation was not material to USAID's payment decisions.

18

### C. *Relators' Position on Materiality*

Relators contend that USAID did not *know* whether BVSPC actually submitted altered documents to the Afghan government but only that Relators had *alleged* as much. Without such confirmation, Relators maintain that materiality cannot be decided on summary judgment. In addition, Relators argue BVSPC misled USAID about the circumstances surrounding the altered documents. Finally according to Relators, the district court did not understand the necessary context when it relied on evidence of USAID's continued payment even after BVSPC gave notice that it had inadvertently submitted altered documents in 2012. None of these arguments persuades us that the violations here were material.

### 1. Confirmation of Relators' Allegations

First, Relators argue that materiality cannot be determined on summary judgment because the evidence shows only that USAID was aware of *allegations* of wrongdoing but did not know whether BVSPC had actually violated any law or contractual provision. As support for this position, Relators rely on a decision from the California Court of Appeal, *San Francisco Unified School District ex rel. Contreras v. First Student, Inc.*, 168 Cal. Rptr. 3d 832 (Ct. App. 2014).

In *Contreras*, the relator alleged the defendant bus company violated California's False Claims Act by requesting payment from the school district despite its noncompliance with multiple maintenance requirements. On appeal, the bus company did not dispute there was evidence "of a substantial number of maintenance failures" and evidence that the condition of buses was "a matter of great importance

19

to the District." *Id.* at 843. "Instead, defendant argue[d] its evidence show[ed] that the alleged false implied certifications were *not* material because the District declined to intervene in the present action, declined to bring an action of its own for breach of contract, always paid defendant's monthly invoices in full, and extended the Contract . . . ." *Id.* The California Court of Appeal found this reasoning "misplaced" because the defendant had not established what the court considered "a critical factual predicate to giving *any* significance to the District's reaction to plaintiffs' allegations—that the District *knew* about the falsity of defendant's implied certifications." *Id.* Although the evidence showed the District was aware of the plaintiffs' allegations, "there [was] no evidence the District had actual knowledge of defendant's wrongdoing—as opposed to allegations of wrongdoing." *Id.* The court therefore reversed the grant of summary judgment because there was "no evidence suggesting the District would have considered the alleged maintenance failures immaterial, *if the District knew the allegations were true*." *Id.* at 844.

*Contreras* is not dispositive or persuasive in this case for several reasons. First and most obviously, we are not bound by a decision from an intermediate state court interpreting a state statute patterned after the FCA. Second, unlike the violation here, the violation in *Contreras* was material to the purpose of the contract. There, the bus company failed to comply with bus maintenance requirements, which it admitted were of great importance to the district and central to the purpose of providing safe transportation of school children. Significantly, upon confirming multiple violations of inspection requirements, the district immediately sent a letter stating, "the District

20

'cannot and will not accept this level of service from the contractor responsible for the safe transportation of its students,'" and directed the bus company to immediately remove noncompliant buses. *Id.* at 846. Third, *Contreras* appears to be the sole case in which a court has concluded the government's actions are irrelevant to the materiality analysis in the absence of confirmation of the relators' allegations. Other courts have found evidence of the government's inaction after learning of *alleged* violations sufficient to establish the lack of materiality. *See, e.g.*, *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 828, 831 (7th Cir. 2011) (finding a lack of materiality in light of the "undisputed fact that the [agency] had already been notified" of the relator's allegations and "failed to take action when it actually learned of the supposed misrepresentation"); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010) (concluding government was not misled by contractor where government signed off on alleged mistakes and continued to express satisfaction even after investigating relator's allegations); *United States ex rel. Smith v. Boeing Co.*, Civil Action No. 05-1073-MLB, 2014 WL 5025782, at *15, *28 (D. Kan. Oct. 8, 2014) (unpublished) (addressing materiality in dicta and concluding that "[a]ny lingering doubt on [the materiality] question [was] dispelled by the actions of the government purchasers after learning of relators' claims" because the government continued to certify the defendant's aircraft and did not take any remedial action).

Here, USAID's actions are telling. USAID knew BVSPC had submitted altered documents in 2012 and that at least some of the altered documents were

21

created on a BVSPC computer and may have been previously submitted to the Afghan government. But USAID did not withhold or suspend payment pending the outcome of the investigations of the altered documents. And it did not reserve any rights while attempting to confirm the truth of Relators' allegations. Instead, USAID paid BVSPC's invoices in full and without reservation. Even if the allegations had been proved, they were merely tangential to the purpose of the Contract, and the undisputed evidence is simply incapable of supporting a finding that USAID may have altered its payment decisions despite the tangential nature of that relationship.

**2.     Evidence That BVSPC Misled USAID**

Relators also argue the evidence shows BVSPC misled USAID in three ways: First, Relators allege "[t]he summary judgment record showed BVSPC made unsubstantiated accusations that Relators may be responsible for forging the diplomas." Second, Relators rely on BVSPC's failure to disclose an internal ethics-committee report suggesting that either Mr. Whitehouse or Mr. Afridi created the altered documents. Finally, Relators argue the evidence supports an inference that BVSPC attempted to conceal copies of employee files.

With respect to the latter argument, the undisputed evidence shows that USAID knew BVSPC could not locate or provide copies of employment files because it had not maintained organized records. These files might have confirmed that altered documents were filed with the Afghan government. But the evidence is undisputed that USAID knew altered documents were actually submitted to the Afghan government in 2012. Yet USAID continued to make payments to BVSPC,

22

accepted BVSPC's work on the Project, and expanded the Contract to include additional work. Under these circumstances, whether BVSPC attempted to conceal copies of employment files is irrelevant.

In their other two arguments, Relators essentially maintain that BVSPC misled USAID with respect to the identity of the person who altered the documents. But there is no evidence from which a reasonable jury could conclude that USAID's decisions were affected by the failure to identify the person responsible. At the very least, USAID knew the documents were created on a BVSPC computer and therefore that someone at BVSPC was likely responsible for the alterations. Nevertheless, USAID continued to pay BVSPC without objection. The undisputed evidence simply does not support Relators' arguments that USAID may have withheld payment if it had learned the identity of the responsible person.

### 3.     2012 Submission of Altered Documents

Finally, Relators argue USAID did not understand the context of BVSPC's admission that it submitted altered documents to the Afghan government in 2012. Relators do not dispute that BVSPC submitted the documents and, upon discovery of the submission, informed USAID. Rather, Relators reiterate their evidence of alleged misrepresentations by BVSPC, which they assert prevented USAID from knowing whether BVSPC had altered the documents and whether BVSPC intentionally or inadvertently submitted them in 2012.

These arguments, however, cannot be sustained in light of Relators' summary-judgment briefing, in which they admitted all facts related to the 2012 submissions.

Relators did not dispute that BVSPC submitted altered documents to the Afghan government on two occasions in 2012 and did not challenge the characterization of these submissions as "inadvertent." And Relators admitted "USAID never took any adverse action against BVSPC despite its awareness of both the altered document allegations and the inadvertent submissions." Thus, it is undisputed that USAID continued to pay even knowing that BVSPC had been accused of submitting altered documents to the Afghan government in 2011 and that BVSPC inadvertently submitted such documents on two occasions in 2012.

In sum, the undisputed evidence demonstrates the altered documents were not material to USAID's payment under the Contract. We therefore affirm the district court's grant of summary judgment based on Relators' failure to prove materiality.[6]

### III.  CONCLUSION

For the above reasons, we AFFIRM the district court's decision granting summary judgment in favor of BVSPC.

---

[6] Because we affirm the district court's decision based on lack of materiality, we do not address its alternative ruling that Relators failed to come forward with evidence of damages.