*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0152P (6th Cir.)
File Name: 04a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BAPTIST PHYSICIAN HOSPITAL
ORGANIZATION, INC.;
BAPTIST HOSPITAL OF EAST
TENNESSEE,
    *Plaintiffs-Appellants,*

v.

HUMANA MILITARY
HEALTHCARE SERVICES, INC.,
    *Defendant-Appellee.*

No. 03-5084

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00588—Thomas W. Phillips, District Judge.

Argued: March 11, 2004

Decided and Filed: May 25, 2004

Before: MERRITT and DAUGHTREY, Circuit Judges;
HOOD, District Judge.[*]

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

## COUNSEL

**ARGUED:** Reuben N. Pelot IV, EGERTON, McAFEE, ARMISTEAD & DAVIS, Knoxville, Tennessee, for Appellants. J. Bruce Miller, J. BRUCE MILLER LAW GROUP, Louisville, Kentucky, for Appellee. **ON BRIEF:** Reuben N. Pelot IV, Cheryl G. Rice, EGERTON, McAFEE, ARMISTEAD & DAVIS, Knoxville, Tennessee, for Appellants. J. Bruce Miller, Michael J. Kitchen, J. BRUCE MILLER LAW GROUP, Louisville, Kentucky, for Appellee.

---

## OPINION

---

MERRITT, Circuit Judge. In this diversity contract action governed by the substantive law of Tennessee, Baptist alleges that Humana, a private government contractor administering the managed healthcare program in Regions 3 and 4 for the Department of Defense, underpaid Baptist for eighty-five separate claims for a total underpayment of over $1.3 million. The Humana Baptist contract defines a reimbursement scheme that is the center of the controversy. Humana has raised a defense to payment based on federal regulations limiting amounts that the government itself will pay to Humana as reimbursement on individual medical claims, and the question is whether these regulations place a limit on the amount Humana must pay Baptist. On cross-motions for summary judgment, the district court granted summary judgment in favor of Humana. We conclude that the federal regulations incorporated by reference into the agreement between Baptist and Humana regulate only the amount the government can contract to pay Humana and not the amount Humana as an independent contractor can promise to pay Baptist. Because these regulations do not prohibit the

reimbursement provisions in the Baptist-Humana network provider agreement, we REVERSE.

## BACKGROUND

Pursuant to authority delegated to it by Congress, the Department of Defense established the Civilian Health and Medical Program of the Uniformed Services, called CHAMPUS, in 1967. CHAMPUS beneficiaries include retired armed forces personnel and dependents of both active and retired military personnel. In 1995, the Department of Defense established TRICARE, a managed health care program operating as a supplement to CHAMPUS and involving the competitive selection of private contractors to financially underwrite the delivery of health care services under CHAMPUS. The overall goal of the TRICARE program is to improve the quality, cost, and accessibility of healthcare to the nation's military through the mechanism of a managed care program, and one aspect of the new TRICARE program was the establishment of "Civilian Preferred Provider Networks." *See* 32 C.F.R. § 199.17(p). TRICARE Management Activity, which was previously known as Office of CHAMPUS, is the government office charged with the responsibility of administering TRICARE/CHAMPUS.

In January 1996, Humana Military Healthcare Services, Inc. was awarded the TRICARE contract for Regions 3 and 4, which covers seven states and includes the State of Tennessee. Under the contract, Humana became the managed care support contractor charged with the responsibility of establishing and managing a Civilian Preferred Provider Network throughout the seven state area. Humana established the preferred provider network by entering into contractual arrangements with individual CHAMPUS participating providers of medical services, one of which was Baptist. Broadly speaking, TRICARE preferred network providers agreed to accept from a managed care support contractor

lower reimbursement rates than those authorized under the CHAMPUS reimbursement system, with the understanding that in exchange they would see an increase in directed volume. These discounted rates might be expressed as discounts from the maximum allowable rate under the CHAMPUS diagnostic grouping system (DRG),[1] or as a fixed per diem rate, or as some other agreed-upon rate of reimbursement.

In the early spring of 1996, Baptist Physician Hospital Organization, Inc. and Baptist Hospital of East Tennessee, or more simply "Baptist," entered into negotiations with Humana to become a TRICARE preferred network provider. In the course of negotiations, Baptist offered a three-tiered system of discounted reimbursement from the CHAMPUS rates depending on the number of other TRICARE providers in the area. On August 6, 1996, the parties entered into a letter-of-agreement by which Humana agreed to the three-tiered system, the "Hospital Payment Arrangement," which was expressed as a percentage discount off the CHAMPUS DRG reimbursement rate with a "stop loss" provision (in the italicized language below) consisting of an increased rate of payment for certain high-dollar inpatient claims as an alternative to a percentage discount from standard government rates. The purpose of the stop-loss provision is to reduce the risk of losses to Baptist in large individual cases that Baptist believed the percentage discount off CHAMPUS DRG rates would create. The contractual provision was expressed as follows:

---

[1] Diagnostic related groups (DRGs) are "a method of dividing hospital patients into clinically coherent groups based on the consumption of resources." 32 C.F.R. § 199.2. "Patients are assigned to the groups based on their principle diagnosis (the reason for admission, determined after study), secondary diagnoses, procedures performed, and the patient's age, sex, and discharge status." *Id.*

**Baptist Health System as Exclusive Provider**

Inpatient
20% Discount from CHAMPUS DRG rates;
*Any case with provider charges greater than
$30,000 reverting to a 45% discount from
provider charges.*
Outpatient
30% Discount from CHAMPUS allowables.

**Baptist Health System + 1 Additional Provider**

Inpatient
20% Discount from CHAMPUS DRG rates;
*Any case with provider charges greater than
$25,000 reverting to a 35% discount from
provider charges.*
Outpatient
25% Discount from CHAMPUS allowables.

**Baptist Health System + 2 Additional Providers**

Inpatient
15% Discount from CHAMPUS DRG rates;
*Any case with provider charges greater than
$25,000 reverting to a 30% discount from
provider charges.*
Outpatient
25% Discount from CHAMPUS allowables.

(Emphasis added.) Under each tier, Baptist and Humana agreed to the "stop loss" language which increased reimbursement to Baptist when a particular inpatient hospital stay exceeded a certain dollar amount. In such cases, the reimbursement rate would not be a percentage discount off the CHAMPUS DRG rate, but rather would "revert" to a percentage discount off the provider charges, which are the

charges the hospital would otherwise charge for the services rendered.

An example illustrates how the "stop loss" provision would work. Suppose a certain hospital stay resulted in provider charges of $77,098, but the maximum CHAMPUS DRG reimbursement rate for this particular stay is only $27,755.00. Without the stop loss provision, Baptist as the exclusive TRICARE provider under the above agreement would receive $22,204, which represents a 20% discount from the CHAMPUS DRG rate and an effective 71% discount from provider charges. Under the stop loss provision, however, Baptist would receive $42,404, or a 45% discount from the provider charges. In effect, the stop loss provision operates to increase the net overall discount for the business associated with the TRICARE program.

As illustrated above, for certain claims the reimbursement amount calculated as a percentage of provider charges was greater than 100% of the CHAMPUS DRG rate. For each of these claims, Humana unilaterally capped the reimbursement amount at 100% of the CHAMPUS DRG rate. After discovering in 1998 that Humana was not paying these claims in full according to the terms of the stop loss provision, Baptist demanded payment of the difference. According to Baptist, Humana refused to honor the provision, insisting instead on renegotiating the contract. Attempts to renegotiate were unsuccessful, and Humana exercised its right to terminate the agreement. On December 7, 2001, Baptist filed a one-count complaint alleging breach of contract and seeking just over $1 million in damages. On May 1, 2002, Humana filed a motion for summary judgment. On that same day, Baptist filed a motion to amend its complaint to add claims for promissory fraud, promissory estoppel and violations of the Tennessee Consumer Protection Act. Baptist moved for partial summary judgment on its breach of contract claim. The district court granted Humana's motion for summary judgment on the breach of contract claim, and in a separate

opinion and order, dismissed the remaining claims as having been filed out of time under the applicable limitations periods.

Baptist appeals the grant of summary judgment in favor of Humana on the breach of contract claim and the dismissal of the promissory estoppel claim for failure to file within three years of accrual. We review de novo the district court's order granting summary judgment de novo, *see Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 464 (6th Cir. 2002), as well as the the district court's order dismissing Baptist's claim based on promissory estoppel, *see Valassis Communications v. Aetna Cas. & Sur. Co.*, 97 F.3d 870, 873 (6th Cir. 1996).

## DISCUSSION

Under Tennessee law, in reviewing a contract for ambiguities, the court considers the contract as a whole. *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). However, "[a] contract is not rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions." *International Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 n.5 (Tenn. Ct. App. 2000). Interpretation of an unambiguous contract is a question of law for the court to decide. *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983). "Where a contract is clear and unambiguous, parties' intentions are to be determined from the four corners of the contract." *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986). Even when the agreement is unambiguous, however, the court may "'consider the situation of the parties and the accompanying circumstances at the time it was entered into – not for the

purpose of modifying or enlarging or curtailing its terms, but to aid in determining'" the contract's meaning. *Hamblen*, 656 S.W.2d at 334 (internal quotation marks omitted).

Humana does not dispute that, on its face, the stop loss clause provides that in the event a particular claim exceeds a certain dollar amount, the reimbursement rate reverts to a discounted amount off billed charges rather than a discount off the CHAMPUS DRG rates. Likewise, Humana does not dispute that there is no other provision in the agreement on its face that would indicate that Humana could cap the payments at 100% of CHAMPUS DRG rates despite the express language of the reimbursement provision. Humana argues that Baptist understood and agreed that payments under the stop loss provision would be capped pursuant to CHAMPUS/TRICARE policies and regulations incorporated by reference into the agreement. Humana asserts that these policies and regulations make clear the parties' agreement that payments made in accordance with the stop loss provision would nevertheless be capped at 100% of CHAMPUS DRG allowables.

The district court ruled that "the regulations and federal law incorporated by reference into the Agreement by the Provider Handbook prohibit payments in excess of the maximum DRG," and that as a CHAMPUS provider bound by the regulations, Baptist "agreed to accept the CHAMPUS-determined allowable as payment in full for its services provided to CHAMPUS beneficiaries when the 'Stop Loss' provision proved inapplicable."

Paragraph C of the provider agreement between Baptist and Humana states:

[Provider] agrees to abide by all quality assurance, utilization review, credentialing, grievance, and other policies and procedures as are established and revised by Humana, and as applicable to CHAMPUS. Such

CHAMPUS policies and procedures are set forth in the Provider Handbook which is hereby incorporated by reference and made part of this Interim Agreement.

We agree with the district court that, through the operation of Paragraph C, the entire Provider Handbook is incorporated by reference into the agreement.

Section 5.4.3 of the Handbook, entitled "TRICARE Payment," states:

PROVIDERS WILL ACCEPT THE TRICARE payment as payment in full for services rendered, not counting the applicable deductible, co-payment or cost share to be collected from the beneficiary. This payment will be the lower of the TRICARE discounted fee or your normal charge. Providers accepting the TRICARE payment cannot use balance billing to beneficiaries for any amount that exceeds the TRICARE payment.

The term "TRICARE discounted fee" is not defined in the Handbook. According to Baptist, it could reasonably interpret "TRICARE discounted fee" to mean a payment made pursuant to the stop loss provision because such payment is in fact based on a discounted fee pursuant to a TRICARE provider agreement. In response, Humana sets out a lengthy recitation of parol evidence relating to the parties' disputed "understandings" during negotiations, concluding with an apparent reference to section 1.0 of the Handbook. That section specifies that in the event of a conflict between the agreement, the handbook and the regulations, the regulations control. Setting aside the parol evidence for the moment, we turn to the regulations to determine whether the terms of the agreement itself evidence the parties' agreement that payments made under the stop loss provision would be capped at the maximum government CHAMPUS DRG rate.

The regulations governing the CHAMPUS program in general are set forth in 32 C.F.R. part 199. Reimbursement methods and rates for the CHAMPUS program are set forth at 32 C.F.R. § 199.14. The CHAMPUS DRG-based system is based on maximum allowable rates and lists diagnoses for which a fixed fee rate is set by the government for inpatient care. *See* 32 C.F.R. § 199.14(a)(1). The groupings used are the same as those used in the Medicare Prospective Payment System. *See id.* § 199.14(a)(1)(i)(A). In order to participate in the CHAMPUS program, a CHAMPUS provider must agree "to accept the CHAMPUS-determined allowable amount as payment in full for medical services and supplies provided to the CHAMPUS beneficiary." *Id.* § 199.6(a)(8).

According to special rules and procedures adopted for TRICARE, the reimbursement system for the TRICARE managed care system can deviate from the CHAMPUS reimbursement system. *See* 32 C.F.R. § 199.17(p)(6). In the event of conflict between the special TRICARE rules set forth in § 199.17 and those rules generally applicable to CHAMPUS, the specific TRICARE rules take precedence. *Id.* § 199.17(a)(4). The special rule relating to reimbursement to TRICARE network providers states:

*Special reimbursement methods for network providers.* The Director, [Office of CHAMPUS], may establish, for preferred provider networks, reimbursement rates and methods different from those established pursuant to § 199.14. Such provisions may be expressed in terms of percentage discounts off CHAMPUS allowable amounts, or in other terms. In circumstances in which payments are based on hospital-specific rates (or other rates specific to particular institutional providers), special reimbursement methods may permit payments based on discounts off national or regional prevailing payment levels, even if higher than particular institution-specific payment rates.

*Id.* § 199.17(p)(6). Administrative rulemaking history indicates that the intent of subsection (p)(6) is to provide regional managed care contractors the flexibility to negotiate reimbursement methods that vary from the payment provisions established by regulation:

> Regarding the suggestion that we provide additional specificity concerning the special reimbursement methods for network providers, we do not agree that additional specifics should be provided. The rule provides added flexibility to vary payment provisions from those established by regulation, to accommodate local market conditions. To attempt to specify in advance the possible reimbursement approaches would defeat our purpose of providing a flexible mechanism. We also disagree that network rate setting should be the same as under standard CHAMPUS rules; a key aim of managed care programs is to negotiate lower rates of reimbursement with networks of preferred providers.

*TRICARE Program*, 60 Fed. Reg. 52, 086, 52,094 (Oct. 5, 1995).

In Chapter 13, section 1.1 of the 1999 TRICARE/CHAMPUS Policy manual, the Director cites 32 C.F.R. § 199.17(p)(6) and answers the question "How are network providers reimbursed under TRICARE?":

> Network provider reimbursement is neither subject to, nor restricted by, amounts that would have otherwise been paid under the standard TRICARE reimbursement methodologies outlined in this chapter (i.e. those reimbursement methodologies applicable only to non-network providers). Managed Care Support (MCS) contractors are free to establish alternative reimbursement systems that will ensure adequate beneficiary access to quality network providers. These alternative reimbursement systems may include, but are

not restricted to: negotiated or discounted fee schedules; usual and customary fees; salary; flat fee; global or profit/risk sharing arrangements for noninstitutional providers; and per diems and capitation payments for institutional providers.

(J.A. at 323.) On September 19, 2000 the Office of the Assistant Secretary of Defense, Health Affairs issued a "Memorandum for Regions 3/4 Contract Administrator" in response to Humana's letter requesting clarification that all claims payments for individual services are subject to maximum payment methodology:

> Humana is correct in stating Chapter 13, Section 1.1, Paragraph IIB of the TRICARE/CHAMPUS Policy Manual can be misleading when read in the absence of associated TMA policy. The intent of the statement "reimbursement is neither, subject to, nor restricted by" is as Humana states, to allow contractors to pay network providers sums in addition to individual claims payments if it is deemed necessary to entice providers into the network. Health care dollars may not be used to pay amounts in excess of the maximum payment methodology set forth by federal law, e.g. DRG, allowable charge, etc., unless approved by the Director OCHAMPUS.

(J.A. at 514.) According to this same memorandum, the policy prohibiting a managed care support contractor from using health care dollars to pay sums in excess of government allowables would be "clarified" in an "upcoming consolidated manual change." (*Id.*)

We conclude that federal regulations and associated TRICARE policies incorporated into the parties' agreement by reference do not categorically bar an independent managed care support contractor, such as Humana, from paying sums in excess of government allowables on certain claims. As

provided by Chapter 13, Section 1.1 of the Policy Manual, the Director has promulgated a general policy that managed care support contractors are "free to establish alternative reimbursement systems that will ensure adequate beneficiary access to quality network providers." The "clarifying" Health Affairs memorandum limits that freedom only to the extent that, absent approval by the Director of the Office of CHAMPUS, "health care dollars" may not be used to pay sums in excess of government allowables. As a result, we need not look beyond the four corners of the agreement to determine that, by its terms, the parties agreed that Humana would pay certain high-dollar claims as a percentage discount off provider charges, and that federal law and regulations do not prohibit such payments so long as the payments are not made with government "health care dollars."

Our job of interpretation is aided, and our conclusion reinforced, by a reimbursement provision in the contract between Humana and the Department of Defense, as well as by a recent district court decision examining the relationship between TRICARE managed care support contractors, such as Humana, and the Department of Defense. Section C-5, j.(2) of the DoD-Humana contract, which was made part of the appellate record through a supplemental filing pursuant to Fed. R. App. P. 28(j), specifies: "All claims payments for individual services (whether in-system or out-of-system) are subject to the maximum payment methodology set forth by federal law . . . . The contractor may pay network providers (on an annual basis or other arrangement) sums in addition to individual claims payments if it is deemed necessary to entice providers into the network." (Appellee's Response to Supp. Filing, Ex. 2.) This provision, which aids in the interpretation of the Humana-Baptist contract, was not disclosed by Humana in the trial court.

In a case filed in a Florida district court, the plaintiffs, a group of institutional providers of outpatient non-surgical services, allege that Humana breached its agreement to pay

agreed-upon reimbursement amounts by capping those amounts at maximum government allowables. In addressing various motions to dismiss, including a motion by Humana to dismiss on the ground that the United States is 100% liable for any breach of the network provider contracts entered into by Humana, the court interpreted Humana's contract with the government and concluded in relevant part:

> The [Managed Care Support] contracts created an arrangement whereby the contractor (Humana) received control over a monthly allotment of governmental funds that the federal government electronically transferred to the contractor's bank account. The [Managed Care Support] contractor has ownership over the funds *and can distribute those funds to network providers as it sees fit*. The contractor cannot pay any claim beyond what federal law allows from the healthcare portion of the allotment; however, *the contractor is permitted to pay network providers beyond the Government's allowed amounts*. If the contractor chooses to do so, then any overage is paid for out of the contractor's administrative portion of the allotment, which results in less profit to the contractor.

*Bay Med. Ctr v. Humana Military Health Care Servs.*, No. 5:03-cv-144/MCR (N.D. Fla. Mar. 16, 2004) (denying, *inter alia*, Humana's motion to dismiss for lack of subject matter jurisdiction on the ground that Humana is the real party in interest for the breach of contract claim) (emphasis added). The reimbursement provision cited above, along with the Florida district court's rejection of Humana's argument that any liability for its breach of a provider contract is directly chargeable to the Treasury, serve to refute Humana's assertion in this case that payments made in excess of CHAMPUS allowables would ultimately come out of the pockets of taxpayers.

Humana proposes that, in the event the Court concludes that the stop loss provision is not subject to a regulatory cap based on government allowables, the Court should nevertheless affirm the grant of summary judgment in its favor on the ground that Baptist waived its claims. This issue was pretermitted below by the district court's decision and is more appropriately decided by the district court in the first instance.

Finally, we need not reach the question whether the district court erred in dismissing Baptist's promissory estoppel claim as untimely filed. As Baptist explains, its promissory estoppel claim is brought as an alternative to its breach of contract claim should this Court conclude that the terms of the agreement pertaining to the stop loss provision are unenforceable or invalid. (See Reply Br. of Appellant at 26.)

**CONCLUSION**

For the foregoing reasons, the order of the district court granting Humana's motion for summary judgment to Humana is REVERSED. This matter is REMANDED to the district court for proceedings not inconsistent with this opinion.